TRACE FORK MINING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 16030. Promulgated March 15, 1929.

*Elwood Hamilton, Esq.,* for the petitioner.
*Harry LeRoy Jones, Esq.,* for the respondent.

876

OPINION.

LITTLETON: The Commissioner allowed depletion in the amount of $378.47, based upon total development cost of $13,624.75 and a life for petitioner's mine of 36 years. The deficiency notice shows that this development cost is made up as follows: development, $2,482.50; siding, $8,000; loss of 1919 capitalized, $3,142.37. The Commissioner also allowed depreciation in the amount of $5,962.64, which he determined as follows:

| Property | Cost | Rate, per cent | Depreciation |
|---|---|---|---|
| Buildings | $29,568.64 | 8 | $2,365.49 |
| Equipment | 16,665.96 | 10 | 1,666.60 |
| Equipment disallowed as expense and capitalized, $14,245.97, averaged | 7,122.99 | 10 | 712.30 |
| Store fixtures | 686.52 | 10 | 68.65 |
| Livestock | 2,048.00 | 20 | 409.60 |
| Livestock disallowed as expense and capitalized, $400, averaged | 200.00 | 20 | 40.00 |
| Tipple | 10,000.00 | 7 | 700.00 |
| Total depreciation allowed | | | 5,962.46 |

The petitioner contends that it is entitled to a total allowance for depletion and depreciation of $11,448.64, based upon a total cost of $114,486.35 for development, equipment, houses, and lease, and an average life of 10 years for these properties. The cost basis is made up as follows:

| | |
|---|---:|
| Houses | $29,568.64 |
| Development | 2,482.50 |
| Equipment | 35,122.23 |
| Leasehold | 40,000.00 |
| Additions of equipment and livestock averaged for six months | 7,312.98 |
| Total | 114,486.35 |

At the hearing the Commissioner conceded that the life of petitioner's mine is 20 years, and not 36 years as stated in the deficiency notice, and that depletion should be redetermined upon the basis of the shorter period.

As to the depreciation on the houses, it will be noted that the parties are in accord as to the basis, cost of $29,568.64, and differ only as to the rate. The Commissioner used a rate of 8 per cent, while the petitioner uses a rate of 10 per cent. Upon the evidence we have found that the life of these houses is from 10 to 13 years, and the rate used by the Commissioner fairly reflects the average. The rate of 10 per cent contended for by the petitioner is premised upon a life of 10 years for the mine, but, for reasons which will be stated later, we believe that this premise is wrong. The allowance by the Commissioner for depreciation of houses will not be disturbed.

As to depletion of development, the Commissioner allowed one thirty-sixth of a total cost of $13,624.75. The cost of development shown in petitioner's schedule of property costs amounts to only $2,482.50, but it has included $32,500 for development in the cost of $40,000 claimed for leasehold. Thus, the depletion claimed by petitioner for development is based upon a total cost of $34,982.50, and a life for the mine of 10 years. We are satisfied from the evidence, and have found as a fact, that the cost of driving the entries and air systems, to January 1, 1920, was not less than $21,562.50. To this amount there should be added $8,000, representing the cost of siding as determined by the Commissioner, making a total cost for development of $29,562.50. The balance sheet, as of January 1, 1920, shows a deficit of $3,142.37, and the Commissioner has included in development cost an item of $3,142.37, representing "loss of 1919 capitalized." If the balance sheet items, houses and development, are increased to reflect the costs of those assets which we have found, the deficit will be wiped out, and the restoration to income of 1919

of expenditures for capital additions will undoubtedly result in showing a net income rather than a loss for that year. For this reason, we have excluded the item of $3,142.37 which the Commissioner included in development cost.

This brings us to the question as to whether the lease acquired by petitioner from Disel, Freeman, and Lawson, at or about the date of organization, for $7,500 par value of capital stock, had a bonus value at the date of acquisition which may be made the subject of a depletion allowance. The Commissioner determined that the lease had no bonus value when paid in, while the petitioner contends that it had a value equal, at least, to the par value of the stock issued therefor. Taking the evidence as a whole, we believe the Commissioner's determination to be correct. Two witnesses testified that in their opinion the lease had a bonus value at the date paid in. The witness Ryley testified that in his opinion the lease had a value of at least $5,000. The witness Dudley was persistently noncommittal in placing a definite value on the lease. Ryley, it was developed on cross-examination, had little or no knowledge of conditions existing in the Hazzard coal field at or about the time the lease was acquired. He was engaged, at the time, in carrying on a coal sales agency business at some distant point. He made his first visit to the field and to petitioner's mine when he acquired petitioner's stock in 1920. Even then his investigation of conditions appears to have been of the most superficial nature. Dudley based his opinion largely upon statements made to him by others as to sales of leases in this and adjacent fields, but of which he had no personal knowledge. He gave evidence as to one transaction involving the sale of a lease in which he had a personal interest, as a stockholder, but that transaction took place in 1920, more than two years after the lease in question was acquired by the petitioner, and at a time when the coal industry was still enjoying a war-made prosperity.

The lease in question was granted by the Kentucky River Coal Corporation. That company owned or controlled more than 145,-000 acres of coal lands in or adjacent to the Hazzard field. It had 33 leases in force, including 7 on Lotts Creek and Trace Fork Creek, in the immediate vicinity of the lands under lease to petitioner. Without objection there was placed in evidence a copy of the report of its leases submitted to the Commissioner by that corporation. Of the 33 leases, 19 were made in the years 1917, 1918, and 1919 on a royalty basis of 10 cents per ton and, in that respect, did not differ from the lease in question.

Petitioner calls our attention to the fact that of the original authorized capital stock, $22,500 par value was sold for cash at par. But we can give only small weight to that fact, as the evidence dis-

closes that nearly all such sales were made to the same persons who paid in the lease for stock.

In view of the foregoing we hold that the lease had no bonus value at the date paid in, and that the total amount which petitioner is entitled to recover through annual allowances for depletion is $29,562.50.

Petitioner contends that the depletion allowance should be determined on the basis of a life for the mine of 10 years. This is the result of a retrospective survey of conditions affecting the lease which were not known to exist and could not have been reasonably anticipated during 1920. According to the statement in the return for 1920, the petitioner estimated that there were 576,000 tons of recoverable coal to be extracted under the lease. In the return for 1922, it was estimated that there were 799,200 tons of coal still to be recovered, and this return was rendered after the survey of 1922, which disclosed that there were but 94 acres of recoverable coal instead of 160 as stated in the lease. We have heretofore had occasion to decide that in determining what is a reasonable allowance for depletion, no consideration could be given to developments which take place in a subsequent year and which could not reasonably have been anticipated. In *Sterling Coal Co., Ltd.*, 8 B. T. A. 549, we held as follows:

The rule contended for by the petitioner is that in the case of mines the rate of depletion applicable for any year is contingent upon the redetermination of the reserves in the ground as ascertained by the development prosecuted and carried on in subsequent years. Under this rule there would be no time until the end of the life of a mine or at least there would be no indefinite length of time before a final estimate of recoverable coal in place could be made. The petitioner contends that unless it is given the right in this case to revise its depletion allowance for 1917, 1918 and 1919 upon an estimate of reserves made in 1922, it will not have returned to it its capital tax-free. In our opinion, this contention is not sound. In the first place, a taxpayer is entitled only to a reasonable allowance for depletion, and that reasonable allowance must of necessity be computed upon the basis of factors known to exist during the year for which the return was filed. It is not in our opinion the purpose of the statute to permit taxpayers to determine their net incomes for a given year on the basis of facts developed in the future.

Under our decision in *Stouts Mountain Coal Co.* v. *Commissioner, supra,* if subsequent developments show that a material error has been made in the original estimates of the ore reserves, a new estimate may be made, and the capital remaining to be recovered distributed accordingly. This is in accordance with article 209 of Regulations 45, and in our opinion is a fair and reasonable interpretation of the statute. To the extent that our opinion in *Appeal of Kehota Mining Co.*, 3 B. T. A. 885, is inconsistent with the views herein expressed, it will not be followed in the future.

What we held there is equally applicable to the case at bar, and the depletion allowance for 1920 should be determined with reference to the estimate made in the return for that year. For the

nine months of 1919 during which it operated, petitioner produced 15,772.80 tons, which is at the rate of approximately 21,000 tons per annum. During 1920 it produced 23,271.50 tons, but the mine was changed during the year from mule power to electric power. In 1921 it produced 27,993.65 tons. With these facts as to production in mind, and the petitioner's estimate in the 1920 return of 576,000 tons of recoverable coal, we believe that a life of 20 years for the mine, which is now conceded by the Commissioner, is fair and reasonable.

Based upon a total cost of $29,562.50 for development, and a life of 20 years for the mine, the petitioner is entitled to a depletion allowance for 1920 of $1,478.13 instead of $378.47 which the Commissioner allowed.

The petitioner asks for an allowance for depreciation of equipment based upon a cost of $42,435.21 and a life of 10 years. Apparently the petitioner has included in the classification of equipment all items other than buildings shown in the Commissioner's depreciation schedule. The Commissioner determined that the cost of all such items was $36,723.47, and he allowed depreciation in respect thereof in the amount of $3,597.15. The evidence does not establish any error in the Commissioner's determination as to costs of the several properties, or in the rates which he used.

Finally, the petitioner claims that the Commissioner has understated its invested capital. The Commissioner has apparently determined invested capital by reference to petitioner's balance sheet as of January 1, 1920. The determination in the deficiency notice is as follows:

Capital Stock_____ $30, 000. 00
Additions:
    Sale of capital stock April 6, 1920, $37,500, prorated 270/366
        days _____ 27, 663. 93
                                                                 57, 663. 93
Deduction:
    Lease to which no value attaches_____ 7, 500. 00

Invested capital for the year_____ 50, 163. 93

In the balance sheet of January 1, 1920, houses are carried at a value of $7,590.02, development at a value of $2,482.50, and there is shown a deficit of $3,142.37. We have found that the cost of miners' houses was not less than $26,950 and that the cost of development was not less than $21,562.50. Restoring to surplus the difference between the actual cost of these two assets and the total of the values at which they are carried in the balance sheet, a difference of $38,439.98, there is a surplus of $35,297.61. Depletion for nine months of 1919 on the development cost of $19,080 restored to surplus, based on a

life for the mine of 20 years, amounts to $715.50. Depreciation for nine months of 1919 on the cost of houses restored to surplus, $19,359.98, at the rate of 8 per cent, amounts to $1,161.60. The total depletion and depreciation for 1919 on costs restored to surplus amounts to $1,877.10, and deducting this amount from surplus leaves an adjusted earned surplus, as of January 1, 1920, of $33,420.51. This amount should be added to the invested capital determined by the Commissioner.

As to physical assets shown in the balance sheet of January 1, 1920, other than houses and development, the evidence fails to establish that the costs thereof exceeded the values at which they are included in the balance sheet. The Commissioner computed the allowance for depreciation of equipment upon the basis of a cost of $36,723.47, which included $7,322.99 for additions made during the year, although, in computing invested capital, he apparently held the cost to be the balance sheet value of $17,422.69. The reasons which led the Commissioner to take this seemingly inconsistent action are not a matter of record. His determination of a basis for computing the depreciation allowance in respect of certain assets greater than the values of those same assets which he allowed for invested capital purposes may have been entirely a concession on his part. We can not assume that one is more correct than the other. The burden of proof that it is entitled to have such assets taken into invested capital at a value greater than that allowed by the Commissioner still remains with the petitioner. The evidence adduced does not suffice to overcome the *prima facie* correctness of the Commissioner's determination.

*Judgment will be entered under Rule 50.*